TIMOTHY J. YOO (SBN 155531)
MONICA Y. KIM (SBN 180139)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

(SANTA ANA DIVISION)

| | |
|---|---|
| In re: | CASE NO. 8:10-bk-10073-ES |
| STAR FOOD INTERNATIONAL, INC., a California corporation, dba "FRESHIA MARKET.", | Chapter 11 |
| Debtor. | **DEBTOR'S EMERGENCY MOTION FOR USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF STEVE PARK IN SUPPORT THEREOF** |
| | DATE:        January 7, 2010<br>TIME:        10:30 a.m.<br>PLACE:      Courtroom 5A<br>                411 West Fourth St.<br>                Santa Ana, CA |

**TO ALL SECURED CREDITORS; THE TWENTY LARGEST**

**UNSECURED CREDITORS; THE OFFICE OF THE UNITED STATES**

**TRUSTEE; AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

Pursuant to Local Bankruptcy Rules 2081-1(c) and 9075-1, and Section 363(c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 4001(d) and 9014 of the Federal Rules of Bankruptcy Procedure, Star Food International, Inc., a California corporation, dba "Freshia Market," Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby moves, on an emergency basis (the "Emergency Motion"), for entry of an interim order authorizing the Debtor to use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the annexed Declaration of Steve Park (the "Park Declaration").  Further description of the Budget is set forth below in the annexed Memorandum.

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 5, 2010 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is engaged in the business of owning and operating three (3) large, full service supermarkets located in Tustin, CA (14551 Red Hill Ave., Tustin, CA 92780), Torrance, CA (2515 Torrance Blvd., Torrance, CA 90503), and Garden Grove, CA (12840 Beach Blvd., Stanton, CA 90680).  Each of the supermarkets features fresh produce, fresh fish and meats, and other food and consumer products including products that cater to the Asian/Korean communities including ready-made Korean foods.

According to the Debtor's books and records, and as described more fully in the annexed Memorandum of Points and Authorities, the Debtor believes that it has 7 creditors which assert

liens against substantially all of the Debtor's assets (collectively, the "Secured Creditors"). The Secured Creditors are owed, in the aggregate, in excess of $7 million as of the Petition Date. While there are other creditors that assert liens upon substantially all of the Debtor's assets, the Debtor believes that the Secured Creditors are the only creditors who may have valid liens against the Debtor's cash collateral.

Of the 7 Secured Creditors, Pacific City Bank ("PCB") purports to have a first priority lien and US Metro Bank ("Metro Bank") purports to have a second priority lien upon substantially all of the Debtor's assets. PCB has a claim approximately $3 million and Metro Bank has a claim of approximately $928,000. Pre-petition, the Debtor was current on all payments required to be made to these two lender, and, post-petition, the Debtor intends to remain current as well.

The main assets of the Debtor are the Debtor's inventory located at the Debtor's markets and good will. As of the Petition Date, the Debtor estimates that the value of the inventory located at its markets is approximately $2 million (at cost) and approximately $2.5 million (at retail). The Debtor does not have the ability to quantify the value of its good will. However, given the nature of the Debtor's business, the Debtor submits that the true value of the Debtor's assets and business as a going concern cannot be ascertained through the use and analysis of a balance sheet. The primary value of the Debtor's business emanates from its customers and their continuing commitment to shop and patronize the Debtor's markets, which, in turn, depends on the quality of the products and services that the Debtor is capable of providing to its customers. Therefore, only by maintaining and strengthening the viability of the Debtor's business can the true value of the Debtor's business be realized for the benefit of the Debtor's creditors. At the same time, the Debtor's viability depends on whether its can reorganize and emerge successfully from Chapter 11.

Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash collateral to pay operating expenses that the Debtor must pay in order to stay in business and preserve the going concern value of its business.  The Budget reflects the expenses that the Debtor must pay for the period from January 1, 2010 through February 28, 2010 (on a weekly basis) to stay in business.  The Debtor will use cash collateral in accordance with the Budget, subject to a permitted deviance of up to 15% of the total expenses for any week, with any unused portions to be carried over into the following week.  Needless to say, the Debtor must be able to use its current cash and its daily sales revenue to stay in business and to pay the Debtor's post-petition operating expenses, including payroll, rent, utilities, etc.  Without the ability to use cash collateral, the Debtor would be forced to shut down its business, lose the going concern value of its business, and fail to reorganize.

As aforementioned, pre-petition, the Debtor was current on its payment obligations to PCB and Metro Bank, which hold the first and second priority liens, respectively, against the Debtor's assets.  With an estimated aggregate secured debt in excess of $7 million owed to the Secured Creditors (of which approximately $3 million is owed to PCB), and approximately $2 million of inventory (at cost) and approximately $2.5 million (at retail), the Debtor submits that the value of the liens that purports to secure the liens asserted by the Secured Creditors, other than PCB, is zero.  Even in the case of the lien asserted by PCB, the value of such lien is undersecured by the current value of the inventory.

As shown by the Budget, the Debtor is using its revenue to buy more goods in order to maintain adequate inventory levels. The Debtor submits that its continuing purchase of goods, which keeps the Debtor's shelves adequately stocked to maintain the good will of its customers, maintains (and likely increases) the value of the liens asserted by PCB and the other Secured Creditors.  Therefore, if allowed to use cash collateral to, among other things, purchase new

inventory to replenish sold inventory, the value of the Debtor's assets and business will remain the same, but more likely increase, and not decline in value.

Given that the Debtor is, and will stay, current on its payment obligations to PCB and Metro Bank, the Debtor submits that these creditors will remain adequately protected despite the Debtor's use of cash collateral.  The continuing operations of the Debtor which include the replenishment of inventory will also serve to adequately protect all of the Secured Creditors.  As additional adequate protection, the Secured Creditors will receive replacement liens against the Debtor's assets, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by such creditors.  While the Debtor is attempting to reach the terms of a consensual cash collateral arrangement with PCB and Metro Bank, given the Debtor's immediate cash needs, the Debtor has filed this emergency motion for authority to use cash collateral.

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on this Emergency Motion earlier than 15 days after service of this Emergency Motion, the Court may conduct a preliminary hearing before such 15-day period expires to enable the Debtor to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing.

Here, the Debtor cannot survive 15 days without any use of cash collateral.  The Debtor must be able to pay expenses in accordance with the Budget pending a final hearing in order to avoid immediate and irreparable harm to the Debtor's business and this bankruptcy estate.

Pursuant to Local Bankruptcy Rule 2081-1(c), General Order, the Debtor submits that the interim relief requested by the Debtor pertaining to the Debtor's use of cash collateral does not contain any of the following provisions:

| **Provision** | **Paragraph** |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |

| Provision | Paragraph |
|---|---|
|  |  |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

The relief sought in the Emergency Motion is based upon the Emergency Motion, the annexed Memorandum of Points and Authorities and Declarations in support of the Emergency Motion, the statements, arguments and representations of counsel to be made at the hearing on the Emergency Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Emergency Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1.      granting the Emergency Motion on an interim basis pending a final hearing thereon;

2.      authorizing the Debtor to use cash collateral to pay the expenses set forth in the Budget on an interim basis pending a final hearing;

3.      setting a final hearing on the Emergency Motion; and

4.      granting such other and further relief as the Court deems just and proper.

Dated: January 5, 2010                STAR FOOD INTERNATIONAL, INC., DBA
                                      "FRESHIA MARKET"

                                      By:___/s/ Monica Y. Kim_____
                                            Timothy J. Yoo
                                            Monica Y. Kim
                                            John-Patrick M. Fritz
                                            LEVENE, NEALE, BENDER, RANKIN & BRILL
                                            L.L.P.
                                            Proposed Attorneys for Chapter 11 Debtor
                                            and Debtor in Possession

MEMORANDUM OF POINTS AND AUTHORITIES

I.

CASE BACKGROUND

A.      Background

On January 5, 2010 (the "Petition Date"), Star Food International, Inc., dba "Freshia Market" ("Freshia") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Following the Petition Date, the Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is engaged in the business of owning and operating three (3) large, full service supermarkets located in Tustin, CA (14551 Red Hill Ave., Tustin, CA 92780), Torrance, CA (2515 Torrance Blvd., Torrance, CA 90503), and Garden Grove, CA (12840 Beach Blvd., Stanton, CA 90680).  Each of the supermarkets features fresh produce, fresh fish and meats, and other food and consumer products including products that cater to the Asian/Korean communities including ready-made Korean foods.  While the Asian population in these communities is significant, the number of supermarkets that cater mainly to Asian clientele is equally high and intense.

The Debtor is a California corporation that was formed in June 2003 by Steve Park, who remains the sole shareholder of the Debtor.  Mr. Park is also the President and Chief Executive Officer of the Debtor.  There are no officers of the Debtor other than Mr. Park.  The Debtor's business started initially with the Tustin market.  In 2007, the Debtor opened its Torrance market, and then in 2008, the Debtor opened its Garden Grove market.  The Debtor occupies each of its markets pursuant to lease and/or sublease agreements with unrelated landlords.

The Debtor expended substantial capital in 2007-2008 in connection with the opening of its Torrance and Garden Grove markets.  Contemporaneously with the significant outlay of

capital related to these new markets, the general downturn and poor state of the economy resulted in a material decrease of the Debtor's sales and revenue. By 2009, the Debtor struggled to meet its operating expenses including timely payment to vendors. This, in turn, made it extremely difficult for the Debtor to maintain a full stock of goods and products on its shelves, which is the lifeblood of the Debtor's viability. Without an adequate stock of fresh goods and products for customers, the Debtor could not survive the competition and stay in business.

By November 2009, the Debtor's inventory was dangerously low, and the Debtor did not have sufficient liquidity to replenish the inventory to satisfactory levels. The Debtor explored a variety of options, including a possible closure or sale of one or more of its markets, and additional financing, however, all of these options required a lot of time to achieve, which, unfortunately, the Debtor did not have.

Fortunately for the Debtor, the Debtor reached a management agreement with an entity known as Zion Markets ("Zion"), which also operates four (4) large, full-scale supermarkets catering to the Asian/Korean communities. Under the management arrangement, Zion agreed essentially to take over the operation of the Debtor's markets. Given their common businesses, the Debtor and Zion share many of the same trade vendors and Zion has substantial experience and knowledge in running the day-to-day affairs of the Debtor's business. The management arrangement immediately sustained the Debtor in at least two (2) different ways: (i) first, based on Zion's strong credit and financial worthiness, trade vendors were willing to deliver products to the Debtor's markets immediately on credit, and (ii) second, Zion actually contributed, over the last several months since the commencement of the management arrangement, approximately $1.5 million towards the purchase of inventory dedicated to the Debtor's markets. As a result, the Debtor's markets have been adequately stocked and the Debtor's business, as a going concern, remains viable.

In addition to the foregoing benefits conferred upon the Debtor by Zion, the principal of Zion, Mr. Kyu M. Hwang ("Mr. Hwang"), personally guarantied certain of the obligations under the Debtor's lease pertaining to the Garden Grove location.  While the Debtor, Zion and the principals of these two companies attempted to finalize the form and content of a formal management agreement pre-petition, the parties never signed a formal management agreement. Nonetheless, and given the exigency associated with keeping the Debtor's markets afloat through an immediate replenishment of inventory, Zion has assumed the responsibility of managing and operating the Debtor's markets since early November 2009.    As part of the management arrangement, the employees who render services at the Debtor's markets are paid wages as Zion employees, but the source of such wages are the sales revenue of the Debtor's markets.

While the Debtor and Zion have made great progress towards stabilizing the operations at the Debtor's markets (especially in the key area of inventory replenishment and sales), the operations continue to be thwarted and saddled with aggressive collection and litigation efforts by creditors.   The Debtor's filing was made to provide the Debtor with the maximum opportunity to survive and to restructure its financial affairs.  Notwithstanding the Chapter 11, Zion has indicated that it will continue to manage and operate the Debtor's supermarkets.  The Debtor and Zion are attempting to finalize their formal management agreement, and once it is executed, the Debtor will seek Court approval of the same.

B.    Creditors and Liabilities of the Debtor

There are a large number of creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon the Debtor's assets. However, as described more fully below, the Debtor granted to only some of these creditors a security interest upon certain of its assets to secure the Debtor's obligations to such creditors.

The Debtor contends that many other creditors are:  (i) not secured creditors at all because the Debtor never granted to these creditors a security interest in its assets, or (ii) recorded financing statements during the 90 day period prior to the Petition Date; therefore, these transfers will be avoided as preferences pursuant to Section 547 of the Bankruptcy Code.   More specifically, the following are creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon the Debtor's assets, and the Debtor's views on the same:

1.     Pacific City Bank ("PCB").   Around August 2007, the Debtor obtained loans from PCB, and granted to PCB a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to PCB.  On August 17, 2007, PCB recorded a financing statement with the California Secretary of State (file no. 20077125998129).   The outstanding balance is approximately $3 million as of this date.  Pre-petition, the Debtor was current on its payment obligations to PCB.  The Debtor intends to timely make all post-petition payments to PCB.

2.     US Metro Bank ("Metro Bank").   Around May 2008, the Debtor obtained a loan from Metro Bank, and granted to Metro Bank a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Metro Bank.  On May 13, 2008, Metro Bank recorded a financing statement with the California Secretary of State (file no. 20087157679030).   The outstanding balance is approximately $928,000 as of this date.   Pre-petition, the Debtor was current on its payment obligations to Metro Bank.  The Debtor intends to timely make all post-petition payments to Metro Bank.

3.     Blue Marine Seafood, Inc. ("Blue Marine").   Blue Marine is a vendor of the Debtor.  On January 9, 2009, Blue Marine recorded 2 financing statements with the California Secretary of State (file no. 20097184082877 and 20097184085800).   The financing statements

purport to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom. **However, the Debtor never granted to Blue Marine in writing a security interest in any of its assets.** Therefore, the Debtor does not believe that Blue Marine has a valid security interest in any of its assets, and is an unsecured creditor of the estate. The Debtor's books and records show that the amount owed to Blue Marine as of the Petition Date is approximately $52,295.11.

4.    Haitai, Inc. ("Haitai"). Haitai is a vendor of the Debtor. On March 16, 2009, Haitai recorded 2 financing statements with the California Secretary of State (file no. 20097190713087 and 20097190713340). The financing statements purport to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom. The Debtor believes that it granted to Haitai in writing a security interest in certain of its assets. The Debtor's books and records show that the amount owed to Haitai as of the Petition Date is approximately $61,202.92.

5.    Warren Investments, LLC ("Warren"). On May 26, 2009, Warrren recorded 2 financing statements with the California Secretary of State (file no. 20097197594718 and 20097197595082). The financing statements purport to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom. The Debtor believes that it granted to Warren in writing a security interest in certain of its assets. The Debtor's books and records show that the amount owed to Warren as of the Petition Date is approximately $1.1 million.

6.    Mr. Pizza Western, Inc. ("Mr. Pizza"). Around October 2008, the Debtor executed a promissory note in favor of Mr. Pizza for the principal amount of $600,000. To secure the note, the Debtor granted to Mr. Pizza a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Mr. Pizza. On July 7, 2009,

Mr. Pizza recorded a financing statement with the California Secretary of State (file no. 20097201561091). The Debtor's books and records show that the amount owed to Mr. Pizza as of the Petition Date is approximately $600,000.

7. **E-Hwa Food Products, Co. ("E-Hwa")**. E-Hwa is a vendor of the Debtor. On July 20, 2009, E-Hwa recorded a financing statement with the California Secretary of State (file no. 20097203253364). The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom. **However, the Debtor never granted to E-Hwa in writing a security interest in any of its assets.** Therefore, the Debtor does not believe that E-Hwa has a valid security interest in any of its assets, and is an unsecured creditor of the estate. The Debtor's books and records show that the amount owed to E-Hwa as of the Petition Date is approximately $290,469.47.

8. **Dokil German Bakery Co. ("Dokil Bakery")**. Dokil Bakery is a vendor of the Debtor. On July 29, 2009, Dokil Bakery recorded a financing statement with the California Secretary of State (file no. 20097203820213). The financing statement purports to cover substantially all assets of the Debtor located at the Tustin, CA supermarket, including the Debtor's inventory and all proceeds therefrom. **However, the Debtor never granted to Dokil Bakery in writing a security interest in any of its assets.** Therefore, the Debtor does not believe that Dokil Bakery has a valid security interest in any of its assets, and is an unsecured creditor of the estate. The Debtor's books and records show that the amount owed to Dokil Bakery as of the Petition Date is approximately $16,499.70.

9. **CJ Foods, Inc. ("CJ Foods")**. CJ Foods is a vendor of the Debtor. On August 3, 2009, CJ Foods recorded a financing statement with the California Secretary of State (file no. 20097204888238). The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom. **However, the Debtor**

**never granted to CJ Foods in writing a security interest in any of its assets.**  Therefore, the Debtor does not believe that CJ Foods has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to CJ Foods as of the Petition Date is approximately $79,534.65.

10.     Don Lee.  On September 2, 2009, Don Lee recorded a financing statement with the California Secretary of State (file no. 20097207334823).  The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  The Debtor believes that it granted to Don Lee in writing a security interest in certain of its assets.  The Debtor's books and records show that the amount owed to Don Lee as of the Petition Date is approximately $280,000.

11.     Cosmos Food Co., Inc. ("Cosmos").  Cosmos is a vendor of the Debtor.  On September 9, 2009, Cosmos recorded a financing statement with the California Secretary of State (file no. 20097207738548).  The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  **However, the Debtor never granted to Cosmos in writing a security interest in any of its assets.**  Therefore, the Debtor does not believe that Cosmos has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to Cosmos as of the Petition Date is approximately $15,423.84.

12.     Lotte International America Corp. ("Lotte").  Around September 1, 2009, the Debtor and Lotte executed a Security Agreement and Description of Collateral which purported to grant to Lotte a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's repayment obligations to Lotte consisting of a credit line in an amount up to $2 million or more.  On September 22, 2009, Lotte recorded a financing statement with the California Secretary of State (file no. 20097208832019).  The Debtor's books and

records show that the amount owed to Lotte as of the Petition Date is approximately $1,177,321.23.

13.     <u>Wang Globalnet ("Wang")</u>.  On or about October 14, 2009, the Debtor executed a Security Agreement in favor of Wang which purports to grant to Wang a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Wang.   On October 16, 2009, Wang recorded a financing statement with the California Secretary of State (file no. 20097211387341).   The recording of this financing statement occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that the granting of the lien and security interest constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.   The Debtor's books and records show that the amount owed to Wang as of the Petition Date is approximately $487,576.09.

14.     <u>Tae Bong America, Inc. ("Tae Bong")</u>.  Tae Bong is a vendor of the Debtor.  On October 22, 2009, Tae Bong recorded a financing statement with the California Secretary of State (file no. 20097212082768).  The financing statement purports to cover all goods received by the Debtor from Tae Bong and all proceeds therefrom.  **However, the Debtor never granted to Tae Bong in writing a security interest in any of its assets.**  Additionally, the recording of this financing statement occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that the granting of the lien and security interest constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.  Therefore, the Debtor does not believe that Tae Bong has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to Tae Bong as of the Petition Date is approximately $59,635.30.

15.     <u>Bekseju USA, Inc. ("Bekseju")</u>.  On November 20, 2009, Bekseju recorded a

Notice of Judgment Lien with the California Secretary of State (file no. 20097215721266).  The recording of this Notice of Judgment Lien occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that any judicial lien asserted by Bekseju constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.  The Debtor's books and records show that the amount owed to Bekseju as of the Petition Date is approximately $1,970.

16.    <u>National Commercial Recovery, Inc. ("NCRI")</u>.  On December 10, 2009, NCRI recorded a Notice of Attachment Lien with the California Secretary of State (file no. 20097216825090).  The recording of this Notice of Attachment Lien occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that any judicial lien asserted by NCRI constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.

The following is a <u>summary</u> of the liens and security interests asserted by creditors as reflected in the search of the California Secretary of State:

| *Name of Creditor* | *Granting of Security Interest* | *Recording Within Preference Period* | *Debtor's Belief As To Validity of Lien and Amount of Indebtedness* |
|---|---|---|---|
| PCB | YES | NO | *Good (approx. $3,000,000)* |
| Metro Bank | YES | NO | *Good (approx. $928,000)* |
| Blue Marine | NO | NO | NO |
| Haitai | YES | NO | *Good (approx. $61,000)* |
| Warren | YES | NO | *Good (approx. $1,100,000)* |
| Mr. Pizza | YES | NO | *Good (approx. $600,000)* |
| E-Hwa | NO | NO | NO |
| Dokil Bakery | NO | NO | NO |
| CJ Foods | NO | NO | NO |
| Don Lee | YES | NO | *Good (approx. $280,000)* |

| | | | |
|---|---|---|---|
| Cosmos | NO | NO | NO |
| Lotte | YES | NO | *Good (approx. $1,177,321)* |
| Wang | YES | YES | NO |
| Tae Bong | NO | YES | NO |
| Bekseju | NO (Judgment Lien) | YES | NO |
| NCRI | NO (Attachment Lien) | YES | NO |
| *Total* | | | *Approx. $7,146,321* |

Based on the foregoing, the Debtor believes that there are, at most, 7 creditors which are likely to have valid and enforceable liens on the Debtor's inventory and the proceeds therefrom. According to the Debtor's books and records, these creditors assert claims in the aggregate of approximately $7,146,321.

In addition to the foregoing, all other financing statements or liens asserted pertain to a lien against equipment only and/or has been filed solely as a precautionary measure by an equipment lessor. A complete lien search of the official records of the California Secretary of State's Office is attached to the Declaration of Monica Y. Kim which is being filed concurrently herewith.

C.    Assets of the Debtor.

The main assets of the Debtor are the Debtor's inventory located at the Debtor's markets and good will. As of the Petition Date, the Debtor estimates that the value of the inventory located at its markets is approximately $2 million (at cost) and approximately $2.5 million (at retail). The Debtor does not have the ability to quantify the value of its good will. However, given the nature of the Debtor's business, the Debtor submits that the true value of the Debtor's assets and business as a going concern cannot be ascertained through the use and analysis of a balance sheet. The primary value of the Debtor's business emanates from its customers and

their continuing commitment to shop and patronize the Debtor's markets, which, in turn, depends on the quality of the products and services that the Debtor is capable of providing to its customers.    Therefore, only by maintaining and strengthening the viability of the Debtor's business can the true value of the Debtor's business be realized for the benefit of the Debtor's creditors.    At the same time, the Debtor's viability depends on whether its can reorganize and emerge successfully from Chapter 11.

D.        The Debtor's Post-Bankruptcy Plans

Because Zion's management of the Debtor's markets, and, in turn, use of Zion's credit, allows for continuing delivery by vendors of products to such markets and ensuring of adequate inventory levels at such markets, it is critical to the Debtor's reorganization that the Debtor continues to obtain management services from Zion during this case.    Towards that end, the Debtor intends to move as quickly as possible to finalize a formal management agreement with Zion and seek Court approval of the same.

Additionally, the Debtor intends to continue to aggressively pursue a financial transaction, including a possible sale of one or more of the markets, locating a financial partner, or pursuing a reorganization plan which provides for continuing management services by Zion of the Debtor's markets.    Needless to say, the Debtor needs time to develop and pursue all of its options and strategies.    Use of cash collateral is vital to maintaining the value of the Debtor's business and assets until the Debtor has had a meaningful opportunity to evaluate and determine the feasibility of all of its options.

E.        The Debtor's Need for Use of Cash Collateral

In order for the Debtor to be able to stay in business until its reorganization goals can be meaningfully assessed and achieved, the Debtor must be able to use its current cash to pay the Debtor's post-petition operating expenses.    A copy of the Debtor's proposed operating budget for

1  the post-petition period of January 1, 2010 to February 28, 2010 (the "Budget") is attached as

2  Exhibit "1" to the Declaration of Steve Park (the "Park Declaration") annexed hereto.

3         Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash

4  collateral on an interim basis pending a final hearing.   The Budget attached to the Park

5  Declaration reflects the ordinary operating expenses that the Debtor must pay in order to stay in

6  business and preserve the going concern value of its business.      The Debtor will use cash

7  collateral in accordance with the Budget, subject to a permitted deviance of up to 15% of the

8  total expenses for any week, with any unused portions to be carried over into the following

9  week.  Needless to say, the Debtor must be able to use its current cash to stay in business and to

10 pay the Debtor's post-petition operating expenses, including payroll, rent, utilities, etc.  Without

11 the ability to use cash collateral, the Debtor would be forced to shut down its business, lose all

12 going concern value, and will fail to reorganize.  The Debtor has prepared the Budget, with the

13 goal of reflecting only those ordinary operating expenses which must be paid to avoid

14 irreparable harm to the Debtor's business.   Therefore, the Debtor submits that it should be

15 authorized to use cash collateral in accordance with the provisions of the Budget.

16        As set forth above, the Debtor believes that it may have up to 7 creditors which assert

17 liens against substantially all of the Debtor's assets (collectively, the "Secured Creditors").  Of

18 these 7 creditors, and as reflected in the lien search of the official records of the California

19 Secretary of State's Office is attached to the Declaration of Monica Y. Kim which is being filed

20 concurrently herewith, PCB purports to have a first priority lien and Metro Bank purports to

21 have a second priority lien upon substantially all of the Debtor's assets.

22        The Secured Creditors are owed, in the aggregate, in excess of $7 million as of the filing

23 date of this case.  PCB, the creditor purporting to have a first priority lien substantially all of the

24 Debtor's assets, asserts a claim of approximately $3 million.   Metro Bank, the creditor

18

19

20

21

22

23

24

25

26

27

28

purporting to have a second priority lien substantially all of the Debtor's assets, asserts a claim of approximately $928,000. While there are other creditors that assert liens upon substantially all of the Debtor's assets, the Debtor believes that the Secured Creditors are the only creditors who may have valid liens against the Debtor's cash collateral.

As aforementioned, pre-petition, the Debtor was current on its payment obligations to PCB and Metro Bank. Post-petition, the Debtor intends to timely make all of its payments to these banks. These payments will keep PCB and Metro Bank adequately protected despite the Debtor's use of cash collateral.

With an estimated aggregate secured debt in excess of $7 million, and approximately $2 million of inventory (at cost) and approximately $2.5 million of inventory (at retail), the Debtor submits that the value of the liens that purports to secure the liens asserted by the Secured Creditors, other than PCB, is zero. Even in the case of the lien asserted by PCB, the value of such lien is undersecured by the current value of the inventory based on PCB's claim of approximately $3 million. The Debtor submits that its continuing operations which includes the continuing purchase of goods by the Debtor, which, in turn, keeps the Debtor's shelves adequately stocked to maintain the good will of its customers, will maintain (and likely increase) the value of the lien asserted by PCB and the other Secured Creditors. Therefore, if allowed to use cash collateral to, among other things, purchase new inventory to replenish sold inventory, the value of the Debtor's assets and business will remain the same, but more likely increase, and not decline in value. Therefore, by continuing to operate, all of the Secured Creditors will remain adequately protected despite the Debtor's use of cash collateral.

As additional adequate protection, the Secured Creditors will receive replacement liens against the Debtor's assets, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by such creditors.

II.

<u>DISCUSSION</u>

A.    <u>The Debtor Must Be Authorized To Use Cash Collateral to Operate, Maintain and</u>

<u>Preserve its Business</u>.

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy

Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under
> section. . .1108. . . of this title and unless the court orders otherwise,
> the trustee may enter into transactions, including the sale or lease of
> property of the estate, in the ordinary course of business, without
> notice or a hearing, and may use property of the estate in the
> ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with

respect to property of the estate, including the right to use property of the estate in compliance

with Section 363.  <u>See</u> 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title,

securities, deposit accounts or other cash equivalents in which the estate and an entity other than

the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special

requirement with respect to "cash collateral," providing that the trustee or debtor in possession

may use "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral
> consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale
> or lease in accordance with the provisions of this section.

<u>See</u> 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); <u>In re Oak Glen R-</u>

<u>Vee</u>, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); <u>In re Tucson Industrial Partners</u>, 129 B.R. 614

1    (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely

2    important that the access to cash collateral be allowed in order to facilitate the goal of

3    reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

4    collateral is necessary to operate a business." In re Dynaco Corporation, 162 B.R. 389 (Bankr.

5    D.N.H. 1993), quoting  In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

6

7         The only source of money available to the Debtor to use to operate its business is the

8    Debtor's current cash on hand and its daily sales revenue. As a result, the Debtor has no ability

9    to continue to operate its business and maintain the going concern value of the Debtor's business

10   unless the Debtor has immediate access to and use of its cash collateral to pay the Debtor's

11   ordinary operating expenses, including, but not limited to, rent, utilities, payroll, etc. The

12   expenses the Debtor must be able to pay during the period of January 1, 2010 through February

13   28, 2010 are set forth in the Budget. The Debtor's inability to pay those expenses would cause

14   immediate and irreparable harm to the Debtor and its business. The inability of the Debtor to

15   use its cash collateral would result in the immediate shut down of the Debtor's business, loss of

16   the going concern value of the Debtor's business and assets, and terminate the estate's

17   opportunity to reorganize.

18

19

20   I.      **B.      The Secured Creditors are Adequately Protected by the**

21           **Debtor's Continued Use Of Cash Collateral.**

22        To the extent that an entity has a valid security interest in the revenues generated by

23   property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

24   Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

25   creditor's cash collateral if the secured creditor is adequately protected. In re Mellor, 734 F.2d

26   1396, 1400 (9th Cir. 1984). See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In

27   re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

28

1      Pursuant to the Supreme Court case of <u>United Savings Association v. Timbers of Inwood</u>

2  <u>Forest Associates</u>, 108 S.Ct. 626, 629 (1988) ("<u>Timbers</u>") and subsequent case law, the property

3  interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

4  Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.

5  <u>See also</u> McCombs, <u>Id.</u>, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the

6
7  secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the

8  collateral."  <u>McCombs</u>, <u>Id.</u>, at 266.  Therefore, the law is clear that only the secured portions of

9  the Secured Creditors' claims are entitled to be adequately protected, AND, pursuant to Section

10  506(a)(1) of the Bankruptcy Code, any undersecured creditor is not entitled to any post-petition

11  interest, fees, costs, or the like on its claim.

12      The principle of adequate protection reconciles the competing interests of the debtor,

13
14  who needs time to reorganize free from harassing creditors, and the secured creditor, which is

15  entitled to constitutional protection for its bargained-for property interest.  <u>See</u>, H.R. Rep. No.

16  95-595, 95th Cong., 1st Sess. (1977), 1978 U.S. Code Cong. & Admin. News, p. 5787.  <u>In re</u>

17  <u>Jug End In The Berkshires, Inc.</u>, 46 B.R. 892 (Bankr.D.Mass.1985).  In <u>re Planned Systems,</u>

18  <u>Inc.</u>, 78 B.R. 852, 862 (Bankr. S.D. Ohio 1987), the Court noted that it is proof of a post-petition

19  decline in the value of the equipment as opposed to a mere lack of equity in the equipment,

20
21  which would support a finding of lack of adequate protection.  It further noted that the existence

22  or non-existence of equity should not be the *sine qua non* for adequate protection.  As the court

23  in <u>In re Smithfield Estates, Inc.</u>, 48 B.R. 910 (Bankr. D. R.I. 1985), observed:

24          "The weight of authority and in our view the better reasoned

25          opinions, hold that adequate protection relates to maintaining the

26          status-quo during the period after the filing of the petition and before

27          confirmation or rejection of the plan.  The secured creditor is entitled

28

23

to protection against any depreciation or diminution in the value of

the collateral as it existed and was available to satisfy the debt on the

date of the filing of the petition in bankruptcy."

Thus, while an equity cushion is generally considered *prima facie* evidence of adequate protection, the absence of an equity cushion does not establish the converse, *i.e.,* that, as a matter of law, the creditor is not adequately protected.   An (under)secured creditor's position is not worse immediately after the bankruptcy filing than it was just prior thereto, and the provisions for adequate protection may only protect the secured creditor from any impairment in the value of its interest.   The concept of adequate protection was not designed or intended to place an undersecured or minimally secured creditor in a better post-filing position than it was in before the imposition of the automatic stay.  Additionally, in determining adequate protection, other courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor.   See, Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Here, the Debtor has been and will continue to be current on its payment obligations to PCB and Metro Bank, which hold the first and second priority liens, respectively, upon the Debtor's inventory and the proceeds therefrom.   Additionally, the continuing operation of the Debtor's business, which necessarily entails the constant replenishment of inventory by the Debtor to ensure that adequate inventory levels are being maintained, preserves, and most likely, increase the value of the Debtor's business.  These factors, in combination, adequately protect the current lien values of all of the Secured Creditors' claims notwithstanding the Debtor's use of cash collateral.

Courts have stressed the importance of promoting a debtor's reorganization.  In In re O'Connor, supra, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

In addition to ongoing payments to PCB and Metro Bank, and the continuing operation of the Debtor's business, the Debtor proposes to provide the Secured Creditors as additional adequate protection a replacement lien against the Debtor's assets, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by such creditor.

**II.      C.      The Procedural Requirements Regarding Approval of the Emergency Motion Have Been Satisfied.**

Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtor is required to serve a copy of the Emergency Motion on any entity with an interest in the Debtor's cash collateral, any committee

1  appointed or on the twenty largest unsecured creditors if not committee has been appointed, and

2  any other entity that the Court directs.  The Debtor has complied with the foregoing by serving a

3  copy of the Emergency Motion by overnight mail for delivery on Wednesday, January 6, 2010

4
5  to the Secured Creditors plus the United States Trustee and those parties who have requested

6  special notice.  No committee has been appointed to date.

7                                          III.

8                                     CONCLUSION

9         Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an

10 order:

11        1.      granting the Emergency Motion on an interim basis pending a final hearing

12 thereon;

13
14        2.      authorizing the Debtor to use cash collateral to pay the expenses set forth in the

15 Budget on an interim basis pending a final hearing;

16        3.      setting a final hearing on the Emergency Motion; and

17        4.      granting such other and further relief as the Court deems just and proper.

18 Dated: January 5, 2010          STAR FOOD INTERNATIONAL, INC., DBA
                                   "FRESHIA MARKET"
19

20                                 By:___/s/ Monica Y. Kim_____
                                        Timothy J. Yoo
21                                      Monica Y. Kim
                                        John-Patrick M. Fritz
22                                      LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
                                        Proposed Attorneys for Chapter 11 Debtor
23                                      and Debtor in Possession

24

25

26

27

28

## **DECLARATION OF STEVE PARK**

I, Steve Park, hereby declare as follows:

1.    I am the President, Chief Executive Officer and Sole Shareholder of Star Food International, Inc., dba "Freshia Market," debtor and debtor in possession herein (the "Debtor"). I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.    On January 5, 2010 (the "Petition Date"), Star Food International, Inc., dba "Freshia Market" ("Freshia") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Following the Petition Date, the Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.    The Debtor is engaged in the business of owning and operating three (3) large, full service supermarkets located in Tustin, CA (14551 Red Hill Ave., Tustin, CA 92780), Torrance, CA (2515 Torrance Blvd., Torrance, CA 90503), and Garden Grove, CA (12840 Beach Blvd., Stanton, CA 90680).  Each of the supermarkets features fresh produce, fresh fish and meats, and other food and consumer products including products that cater to the Asian/Korean communities including ready-made Korean foods.  While the Asian population in these communities is significant, the number of supermarkets that cater mainly to Asian clientele is equally high and intense.

4.    The Debtor is a California corporation that was formed in June 2003 by me.  I remain the sole shareholder of the Debtor.  I am also the President and Chief Executive Officer of the Debtor.  There are no officers of the Debtor other than me.  The Debtor's business started initially with the Tustin market.  In 2007, the Debtor opened its Torrance market, and then in

2008, the Debtor opened its Garden Grove market.  The Debtor occupies each of its markets pursuant to lease and/or sublease agreements with unrelated landlords.

5.    The Debtor expended substantial capital in 2007-2008 in connection with the opening of its Torrance and Garden Grove markets.  Contemporaneously with the significant outlay of capital related to these new markets, the general downturn and poor state of the economy resulted in a material decrease of the Debtor's sales and revenue.  By 2009, the Debtor struggled to meet its operating expenses including timely payment to vendors.  This, in turn, made is extremely difficult for the Debtor to maintain a full stock of goods and products on its shelves, which is the lifeblood of the Debtor's viability.  Without an adequate stock of fresh goods and products for customers, the Debtor could not survive the competition and stay in business.

6.    By November 2009, the Debtor's inventory was dangerously low, and the Debtor did not have sufficient liquidity to replenish the inventory to satisfactory levels.  The Debtor explored a variety of options, including a possible closure or sale of one or more of its markets, and additional financing, however, all of these options required a lot of time to achieve, which, unfortunately, the Debtor did not have.

7.    Fortunately for the Debtor, the Debtor reached a management agreement with an entity known as Zion Markets ("Zion"), which also operates four (4) large, full-scale supermarkets catering to the Asian/Korean communities.  Under the management arrangement, Zion agreed essentially to take over the operation of the Debtor's markets.  Given their common businesses, the Debtor and Zion share many of the same trade vendors and Zion has substantial experience and knowledge in running the day-to-day affairs of the Debtor's business.  The management arrangement immediately sustained the Debtor in at least two (2) different ways: (i) first, based on Zion's strong credit and financial worthiness, trade vendors were willing to

deliver products to the Debtor's markets immediately on credit, and (ii) second, Zion actually contributed, over the last several months since the commencement of the management arrangement, approximately $1.5 million towards the purchase of inventory dedicated to the Debtor's markets.   As a result, the Debtor's markets have been adequately stocked and the Debtor's business, as a going concern, remains viable.

8.      In addition to the foregoing benefits conferred upon the Debtor by Zion, the principal of Zion, Mr. Kyu M. Hwang ("Mr. Hwang"), personally guarantied certain of the obligations under the Debtor's lease pertaining to the Garden Grove location.  While the Debtor, Zion and the principals of these two companies attempted to finalize the form and content of a formal management agreement pre-petition, the parties never signed a formal management agreement.   Nonetheless, and given the exigency associated with keeping the Debtor's markets afloat through an immediate replenishment of inventory, Zion has assumed the responsibility of managing and operating the Debtor's markets since early November 2009.    As part of the management arrangement, the employees who render services at the Debtor's markets are paid wages as Zion employees, but the source of such wages are the sales revenue of the Debtor's markets.

9.      While the Debtor and Zion have made great progress towards stabilizing the operations at the Debtor's markets (especially in the key area of inventory replenishment and sales), the operations continue to be thwarted and saddled with aggressive collection and litigation efforts by creditors.  The Debtor's filing was made to provide the Debtor with the maximum opportunity to survive and to restructure its financial affairs.  Notwithstanding the Chapter 11, Zion has indicated that it will continue to manage and operate the Debtor's supermarkets.   The Debtor and Zion are attempting to finalize their formal management agreement, and once it is executed, the Debtor will seek Court approval of the same.

10.     There are a large number of creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon the Debtor's assets.  However, as described more fully below, the Debtor granted to only some of these creditors a security interest upon certain of its assets to secure the Debtor's obligations to such creditors.  The Debtor contends that many other creditors are:  (i) not secured creditors at all because the Debtor never granted to these creditors a security interest in its assets, or (ii) recorded financing statements during the 90 day period prior to the Petition Date; therefore, I understand that these transfers can be avoided as preferences pursuant to Section 547 of the Bankruptcy Code.    More specifically, the following are creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon the Debtor's assets, and the Debtor's views on the same:

11.     Pacific City Bank ("PCB").  Around August 2007, the Debtor obtained loans from PCB, and granted to PCB a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to PCB.  On August 17, 2007, PCB recorded a financing statement with the California Secretary of State (file no. 20077125998129).   The outstanding balance is approximately $3 million as of this date.  Pre-petition, the Debtor was current on its payment obligations to PCB.  The Debtor intends to timely make all post-petition payments to PCB.

12.     US Metro Bank ("Metro Bank").  Around May 2008, the Debtor obtained a loan from Metro Bank, and granted to Metro Bank a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Metro Bank.  On May 13, 2008, Metro Bank recorded a financing statement with the California Secretary of State (file no. 20087157679030).  The outstanding balance is approximately $928,000 as of this date.  Pre-petition, the Debtor was current on its payment obligations to Metro Bank.  The Debtor intends

to timely make all post-petition payments to Metro Bank.

13.    <u>Blue Marine Seafood, Inc. ("Blue Marine")</u>.  Blue Marine is a vendor of the Debtor.  On January 9, 2009, Blue Marine recorded 2 financing statements with the California Secretary of State (file no. 20097184082877 and 20097184085800).  The financing statements purport to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  **However, the Debtor never granted to Blue Marine in writing a security interest in any of its assets.**  Therefore, the Debtor does not believe that Blue Marine has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to Blue Marine as of the Petition Date is approximately $52,295.11.

14.    <u>Haitai, Inc. ("Haitai")</u>.  Haitai is a vendor of the Debtor.  On March 16, 2009, Haitai recorded 2 financing statements with the California Secretary of State (file no. 20097190713087 and 20097190713340).   The financing statements purport to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  The Debtor believes that it granted to Haitai in writing a security interest in certain of its assets.  The Debtor's books and records show that the amount owed to Haitai as of the Petition Date is approximately $61,202.92.

15.    <u>Warren Investments, LLC ("Warren")</u>.  On May 26, 2009, Warrren recorded 2 financing statements with the California Secretary of State (file no. 20097197594718 and 20097197595082).   The financing statements purport to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.   The Debtor believes that it granted to Warren in writing a security interest in certain of its assets.  The Debtor's books and records show that the amount owed to Warren as of the Petition Date is approximately $1.1 million.

31

16.     <u>Mr. Pizza Western, Inc. ("Mr. Pizza")</u>.   Around October 2008, the Debtor executed a promissory note in favor of Mr. Pizza for the principal amount of $600,000.   To secure the note, the Debtor granted to Mr. Pizza a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Mr. Pizza.   On July 7, 2009, Mr. Pizza recorded a financing statement with the California Secretary of State (file no. 20097201561091).   The Debtor's books and records show that the amount owed to Mr. Pizza as of the Petition Date is approximately $600,000.

17.     <u>E-Hwa Food Products, Co. ("E-Hwa")</u>.   E-Hwa is a vendor of the Debtor.   On July 20, 2009, E-Hwa recorded a financing statement with the California Secretary of State (file no. 20097203253364).   The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.   **However, the Debtor never granted to E-Hwa in writing a security interest in any of its assets.**   Therefore, the Debtor does not believe that E-Hwa has a valid security interest in any of its assets, and is an unsecured creditor of the estate. The Debtor's books and records show that the amount owed to E-Hwa as of the Petition Date is approximately $290,469.47.

18.     <u>Dokil German Bakery Co. ("Dokil Bakery")</u>.   Dokil Bakery is a vendor of the Debtor.   On July 29, 2009, Dokil Bakery recorded a financing statement with the California Secretary of State (file no. 20097203820213).   The financing statement purports to cover substantially all assets of the Debtor located at the Tustin, CA supermarket, including the Debtor's inventory and all proceeds therefrom.   **However, the Debtor never granted to Dokil Bakery in writing a security interest in any of its assets.**   Therefore, the Debtor does not believe that Dokil Bakery has a valid security interest in any of its assets, and is an unsecured creditor of the estate.   The Debtor's books and records show that the amount owed to Dokil Bakery as of the Petition Date is approximately $16,499.70.

19.     CJ Foods, Inc. ("CJ Foods").  CJ Foods is a vendor of the Debtor.  On August 3, 2009, CJ Foods recorded a financing statement with the California Secretary of State (file no. 20097204888238).   The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  **However, the Debtor never granted to CJ Foods in writing a security interest in any of its assets.**  Therefore, the Debtor does not believe that CJ Foods has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to CJ Foods as of the Petition Date is approximately $79,534.65.

20.     Don Lee.  On September 2, 2009, Don Lee recorded a financing statement with the California Secretary of State (file no. 20097207334823).  The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  The Debtor believes that it granted to Don Lee in writing a security interest in certain of its assets.  The Debtor's books and records show that the amount owed to Don Lee as of the Petition Date is approximately $280,000.

21.     Cosmos Food Co., Inc. ("Cosmos").   Cosmos is a vendor of the Debtor.  On September 9, 2009, Cosmos recorded a financing statement with the California Secretary of State (file no. 20097207738548).  The financing statement purports to cover substantially all assets of the Debtor, including the Debtor's inventory and all proceeds therefrom.  **However, the Debtor never granted to Cosmos in writing a security interest in any of its assets.**  Therefore, the Debtor does not believe that Cosmos has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to Cosmos as of the Petition Date is approximately $15,423.84.

22.     Lotte International America Corp. ("Lotte").   Around September 1, 2009, the Debtor and Lotte executed a Security Agreement and Description of Collateral which purported

to grant to Lotte a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's repayment obligations to Lotte consisting of a credit line in an amount up to $2 million or more. On September 22, 2009, Lotte recorded a financing statement with the California Secretary of State (file no. 20097208832019). The Debtor's books and records show that the amount owed to Lotte as of the Petition Date is approximately $1,177,321.23.

23.     Wang Globalnet ("Wang"). On or about October 14, 2009, the Debtor executed a Security Agreement in favor of Wang which purports to grant to Wang a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Wang. On October 16, 2009, Wang recorded a financing statement with the California Secretary of State (file no. 20097211387341). The recording of this financing statement occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that the granting of the lien and security interest constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code. The Debtor's books and records show that the amount owed to Wang as of the Petition Date is approximately $487,576.09.

24.     Tae Bong America, Inc. ("Tae Bong"). Tae Bong is a vendor of the Debtor. On October 22, 2009, Tae Bong recorded a financing statement with the California Secretary of State (file no. 20097212082768). The financing statement purports to cover all goods received by the Debtor from Tae Bong and all proceeds therefrom. **However, the Debtor never granted to Tae Bong in writing a security interest in any of its assets.** Additionally, the recording of this financing statement occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that the granting of the lien and security interest constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.

Therefore, the Debtor does not believe that Tae Bong has a valid security interest in any of its assets, and is an unsecured creditor of the estate.  The Debtor's books and records show that the amount owed to Tae Bong as of the Petition Date is approximately $59,635.30.

25.    <u>Bekseju USA, Inc. ("Bekseju")</u>.  On November 20, 2009, Bekseju recorded a Notice of Judgment Lien with the California Secretary of State (file no. 20097215721266).  The recording of this Notice of Judgment Lien occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that any judicial lien asserted by Bekseju constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.  The Debtor's books and records show that the amount owed to Bekseju as of the Petition Date is approximately $1,970.

26.    <u>National Commercial Recovery, Inc. ("NCRI")</u>.  On December 10, 2009, NCRI recorded a Notice of Attachment Lien with the California Secretary of State (file no. 20097216825090).  The recording of this Notice of Attachment Lien occurred within the 90 day period prior to the Petition Date; therefore, the Debtor believes that any judicial lien asserted by NCRI constitutes a transfer for the benefit of a creditor that is avoidable as a preference under Section 547 of the Bankruptcy Code.

27.    The following is a <u>summary</u> of the liens and security interests asserted by creditors as reflected in the search of the California Secretary of State:

| Name of Creditor | Granting of Security Interest | Recording Within Preference Period | Debtor's Belief As To Validity of Lien and Amount of Indebtedness |
|---|---|---|---|
| PCB | YES | NO | Good (approx. $3,000,000) |
| Metro Bank | YES | NO | Good (approx. $928,000) |
| Blue Marine | NO | NO | NO |
| Haitai | YES | NO | Good (approx. $61,000) |
| Warren | YES | NO | Good (approx. $1,100,000) |

| | | | |
|---|---|---|---|
| Mr. Pizza | YES | NO | **Good (approx. $600,000)** |
| E-Hwa | NO | NO | NO |
| Dokil Bakery | NO | NO | NO |
| CJ Foods | NO | NO | NO |
| Don Lee | YES | NO | **Good (approx. $280,000)** |
| Cosmos | NO | NO | NO |
| Lotte | YES | NO | **Good (approx. $1,177,321)** |
| Wang | YES | YES | NO |
| Tae Bong | NO | YES | NO |
| Bekseju | NO  (Judgment Lien) | YES | NO |
| NCRI | NO (Attachment Lien) | YES | NO |
| **Total** | | | **Approx. $7,146,321** |

28.    Based on the foregoing, the Debtor believes that there are, at most, 7 creditors which are likely to have valid and enforceable liens on the Debtor's inventory and the proceeds therefrom.  According to the Debtor's books and records, these creditors assert claims in the aggregate of approximately $7,146,321.

29.    In addition to the foregoing, all other financing statements or liens asserted pertain to a lien against equipment only and/or has been filed solely as a precautionary measure by an equipment lessor.  A complete lien search of the official records of the California Secretary of State's Office is attached to the Declaration of Monica Y. Kim which is being filed concurrently herewith.

30.    The main assets of the Debtor are the Debtor's inventory located at the Debtor's markets and good will.  As of the Petition Date, the Debtor estimates that the value of the inventory located at its markets is approximately $2 million (at cost) and approximately $2.5 million (at retail).  The Debtor does not have the ability to quantify the value of its good will.

However, given the nature of the Debtor's business, the Debtor submits that the true value of the Debtor's assets and business as a going concern cannot be ascertained through the use and analysis of a balance sheet. The primary value of the Debtor's business emanates from its customers and their continuing commitment to shop and patronize the Debtor's markets, which, in turn, depends on the quality of the products and services that the Debtor is capable of providing to its customers. Therefore, only by maintaining and strengthening the viability of the Debtor's business can the true value of the Debtor's business be realized for the benefit of the Debtor's creditors. At the same time, the Debtor's viability depends on whether its can reorganize and emerge successfully from Chapter 11.

31.      Because Zion's management of the Debtor's markets, and, in turn, use of Zion's credit, allows for continuing delivery by vendors of products to such markets and ensuring of adequate inventory levels at such markets, it is critical to the Debtor's reorganization that the Debtor continues to obtain management services from Zion during this case. Towards that end, the Debtor intends to move as quickly as possible to finalize a formal management agreement with Zion and seek Court approval of the same.

32.      Additionally, the Debtor intends to continue to aggressively pursue a financial transaction, including a possible sale of one or more of the markets, locating a financial partner, or pursuing a reorganization plan which provides for continuing management services by Zion of the Debtor's markets. Needless to say, the Debtor needs time to develop and pursue all of its options and strategies. Use of cash collateral is vital to maintaining the value of the Debtor's business and assets until the Debtor has had a meaningful opportunity to evaluate and determine the feasibility of all of its options.

33.      In order for the Debtor to be able to stay in business until its reorganization goals can be meaningfully assessed and achieved, the Debtor must be able to use its current cash to

pay the Debtor's post-petition operating expenses.  A copy of the Debtor's proposed operating budget for the post-petition period of January 1, 2010 to February 28, 2010 (the "Budget") is attached as Exhibit "1" hereto.

34.    Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash collateral on an interim basis pending a final hearing.  The Budget attached hereto reflects the ordinary operating expenses that the Debtor must pay in order to stay in business and preserve the going concern value of its business.   The Debtor will use cash collateral in accordance with the Budget, subject to a permitted deviance of up to 15% of the total expenses for any week, with any unused portions to be carried over into the following week.  Needless to say, the Debtor must be able to use its current cash to stay in business and to pay the Debtor's post-petition operating expenses, including payroll, rent, utilities, etc.  Without the ability to use cash collateral, the Debtor would be forced to shut down its business, lose all going concern value, and will fail to reorganize.  The Debtor has prepared the Budget, with the goal of reflecting only those ordinary operating expenses which must be paid to avoid irreparable harm to the Debtor's business.  Therefore, the Debtor submits that it should be authorized to use cash collateral in accordance with the provisions of the Budget.

35.    As set forth above, the Debtor believes that it may have up to 7 creditors which assert liens against substantially all of the Debtor's assets (collectively, the "Secured Creditors").  Of these 7 creditors, and as reflected in the lien search of the official records of the California Secretary of State's Office is attached to the Declaration of Monica Y. Kim which is being filed concurrently herewith, PCB purports to have a first priority lien and Metro Bank purports to have a second priority lien upon substantially all of the Debtor's assets.

36.    The Secured Creditors are owed, in the aggregate, in excess of $7 million as of the filing date of this case.  PCB, the creditor purporting to have a first priority lien substantially

all of the Debtor's assets, asserts a claim of approximately $3 million.  Metro Bank, the creditor

purporting to have a second priority lien substantially all of the Debtor's assets, asserts a claim

of approximately $928,000.  While there are other creditors that assert liens upon substantially

all of the Debtor's assets, the Debtor believes that the Secured Creditors are the only creditors

who may have valid liens against the Debtor's cash collateral.

37.    As aforementioned, pre-petition, the Debtor was current on its payment

obligations to PCB and Metro Bank.  Post-petition, the Debtor intends to timely make all of

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

its payments to these banks.   The Debtor contends that these payments will keep PCB and
Metro Bank adequately protected despite the Debtor's use of cash collateral.

38.   With an estimated aggregate secured debt in excess of $7 million, and
approximately $2 million of inventory (at cost) and approximately $2.5 million of inventory (at
retail), the Debtor submits that the value of the liens that purports to secure the liens asserted
by the Secured Creditors, other than PCB, is zero.   Even in the case of the lien asserted by
PCB, the value of such lien is undersecured by the current value of the inventory based on
PCB's claim of approximately $3 million.   The Debtor submits that its continuing operations
which includes the continuing purchase of goods by the Debtor, which, in turn, keeps the
Debtor's shelves adequately stocked to maintain the good will of its customers, will maintain
(and likely increase) the value of the lien asserted by PCB and the other Secured Creditors.
Therefore, if allowed to use cash collateral to, among other things, purchase new inventory to
replenish sold inventory, the value of the Debtor's assets and business will remain the same,
but more likely increase, and not decline in value.   Therefore, by continuing to operate, the
Debtor believes that all of the Secured Creditors will remain adequately protected despite the
Debtor's use of cash collateral.

39.   As additional adequate protection, the Secured Creditors will receive
replacement liens against the Debtor's assets, with such replacement lien to have the same
extent, validity, and priority as the pre-petition lien held by such creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of January, 2010 at Los Angeles, California.

_____
STEVE PARK

44

# EXHIBIT 1

EXHIBIT "1"

**Budget**
**January 2010**
**All Locations**

|  | Jan. 2 – Jan. 8 | Jan. 9 – Jan. 15 | Jan. 16 – Jan. 22 | Jan. 23 – Jan. 29 |
|---|---|---|---|---|
| Sales | 700,000 | 700,000 | 700,00 | 700,000 |
| Rental income | 72,000 |  |  |  |
| TOTAL | 772,000 | 700,000 | 700,000 | 700,000 |
| Cost of Goods | 560,000 | 560,000 | 560,000 | 560,000 |
| Gross Profit | 212,000 | 140,000 | 140,000 | 140,000 |
| *Expenses* |  |  |  |  |
| Wages and related taxes | 84,000 | 84,000 | 84,000 | 84,000 |
| Credit card fees | 7,000 | 7,000 | 7,000 | 7,000 |
| Rent | 139,000 |  |  |  |
| Electricity | 42,000 |  |  |  |
| Water | 7,100 |  |  |  |
| Gas | 1,950 |  |  |  |
| Insurance | 7,000 |  |  |  |
| Janitorial | 4,000 | 4,000 | 4,000 | 4,000 |
| Security | 2,625 | 2,625 | 2,625 | 2,625 |
| Miscellaneous G&A | 3,750 | 3,750 | 3,750 | 3,750 |
| Loan payment to Pacific City Bank and Metro Bank | 46,000 |  |  |  |

**Budget**
**February 2010**
**All Locations**

| | *Jan. 30 – Feb. 5* | *Feb. 6 – Feb. 12* | *Feb. 13 – Feb. 19* | *Feb. 20 – Feb. 26* |
|---|---|---|---|---|
| Sales | 700,000 | 700,000 | 700,00 | 700,000 |
| Rental income | 72,000 | | | |
| TOTAL | 772,000 | 700,000 | 700,000 | 700,000 |
| Cost of Goods | 560,000 | 560,000 | 560,000 | 560,000 |
| Gross Profit | 212,000 | 140,000 | 140,000 | 140,000 |
| | | | | |
| *Expenses* | | | | |
| Wages and related taxes | 84,000 | 84,000 | 84,000 | 84,000 |
| Credit card fees | 7,000 | 7,000 | 7,000 | 7,000 |
| Rent | 139,000 | | | |
| Electricity | 42,000 | | | |
| Water | 7,100 | | | |
| Gas | 1,950 | | | |
| Insurance | 7,000 | | | |
| Janitorial | 4,000 | 4,000 | 4,000 | 4,000 |
| Security | 2,625 | 2,625 | 2,625 | 2,625 |
| Miscellaneous G&A | 3,750 | 3,750 | 3,750 | 3,750 |
| Loan payment to Pacific City Bank and Metro Bank | 46,000 | | | |